328 So.2d 231 (1976)
ANDOVER DEVELOPMENT CORPORATION, Appellant,
v.
CITY OF NEW SMYRNA BEACH et al., Appellees.
Nos. W-332 and W-342.
District Court of Appeal of Florida, First District.
February 10, 1976.
Rehearing Denied March 29, 1976.
*232 George E. Adams, Adams, Gilman & Cooper, Orlando, for appellant.
Noah C. McKinnon and Dale K. Bohner, Coble, McKinnon, Reynolds & Rothert, Daytona Beach, and Charles A. Hall, New Smyrna Beach, for appellees.
Swann & Glass, Coral Gables, for amicus curiae.
RAWLS, Judge.
Zoning is the subject of this imbroglio. Plaintiff-appellant Andover has struggled for years to procure a building permit for a condominium apartment development on a large parcel of land (between 47 and 54 acres)[1] in New Smyrna Beach. A condensed history will subsequently be related, but for the present suffice it to say that for a period of time Andover and New Smyrna Beach officials were in accord, *233 while a group of citizens were strenuously opposed to Andover's proposed development. Ultimately through the procedure of initiative and referendum, the zoning ordinance applicable to Andover's property was repealed and an ordinance severely restricting density of buildings was enacted. Andover then filed two suits against the City of New Smyrna Beach and its individual commissioners: the first being a petition for writ of mandamus seeking to require issuance of building permits; the second sought injunctive relief upon the theory of equitable estoppel to require the city to approve certain plans submitted by Andover and to issue the necessary permits to allow it to commence construction. The trial court found that Andover had failed to prove its entitlement to equitable estoppel and quashed the alternative writ of mandamus. Hence these consolidated appeals.
The two dispositive points on appeal are: 1) that the initiative election under the facts herein related was unconstitutional in that it violated the due process clauses of the Constitutions of the State of Florida and the United States of America, and 2) the City of New Smyrna Beach was estopped by its conduct and Andover's reliance thereon from changing the zoning on its property. Both points are meritorious, therefore, we reverse.
Prior to the summer of 1970, the tract of land involved in this dispute was zoned R-1 which permitted construction of single family residences only. On May 12, 1970, the city passed Zoning Ordinance No. 797 which established a zoning classification to be used in the city of RR-PUD, or Residential Resort-Planned Unit Development. The PUD ordinance provided in part that multiple-story developments were permitted and that the development could be used for multi-family, certain retail and business uses, along with provisions for golf courses, tennis courts, marinas, etc. The ordinance also set forth requirements as to density per acre, height limitations, required square footage per development unit, open spaces, waterfront uses, etc. Sections 30 and 31 in Article III of the ordinance set forth in detail the procedure for procuring RR-PUD zoning. This procedure basically is that a landowner shall submit either an outlined development plan or a preliminary plan to the city's zoning board and the city commission for approval. Upon approval by both the zoning board and the city commission, the property is rezoned RR-PUD. On November 10, 1970, the city via Ordinance No. 808 rezoned the subject property to RR-PUD. At this time the property was owned by Andover's predecessor in title, Indiatlantic Corporation, of which Mr. Wayne D. Boyette was its president.
A group of citizens who termed themselves as "North Beach Property Owners Association, an unincorporated association, for itself and all persons similarly situated" filed suit subsequent to the city's rezoning of the subject property from low density single family residential zoning classification to residential resort-planned unit development classification. The suit was dismissed by the trial court on February 1, 1972, for lack of standing, and North Beach Property Owners appealed to this court. We affirmed the trial court's judgment in a per curiam opinion rendered on April 12, 1973.[2] It is significant that the city successfully defended its RR-PUD Ordinance No. 797 and its Ordinance No. 808 rezoning the subject property in the trial court and in this court as late as April 12, 1973.[3]
*234 On November 30, 1971, subsequent to the property being rezoned RR-PUD and after Mr. Boyette received final approval from the city for his master plan and development of Phase I, Mr. Boyette, on behalf of Indiatlantic Corporation, signed a contract with Andover to sell the subject property for $1,000,701.00. The contract was conditioned upon the land remaining zoned RR-PUD and upon Andover obtaining satisfactory financing arrangements. An attorney for Andover testified that the corporation would not have purchased the property if the citizens' suit had not been dismissed on February 1, 1972. Prior to final closing, representatives of Andover, Mr. Boyette, and several attorneys met with various citizens who were opposed to the proposed development, but no accord was reached. On February 8, 1972, a petition was presented to the city commission containing 1,065 signatures of persons requesting that an election be scheduled, so that the city could present to the electorate a proposed ordinance which would prohibit any buildings in New Smyrna Beach which exceeded three stories in height. On February 11, 1972, Andover procured from Continental Mortgage Investors Corporation (amicus curiae) a development loan in the sum of $2.6 million dollars, and on February 18, 1972, the sale of the property from Indiatlantic to Andover was consummated.
Prior to closing and for several months thereafter, principals of Andover worked with the city manager, the head of the building department, the chairman of the planning and zoning board, and other representatives of the city on various aspects of developing the subject property. Andover and the "city people" felt that a better development plan than the Boyette plan (which had previously been submitted and approved as to the master plan and development of Phase I) could be devised. During the remainder of 1972, Andover worked with the city's representatives, architects, engineers, land developers, surveyors, sewer and drainage experts, environmental experts, and others in devising an amended development plan for the land. The city finally advised Andover that since it was substantially amending the Boyette plan, it would be necessary to start the whole process over for obtaining the city's approval for development pursuant to the PUD zoning. On February 12, 1973, Andover presented its preliminary development plans to the planning board and approval was given. On March 27, 1973, the city commission considered the preliminary plans. Certain citizens appeared before the commission and voiced their opposition against allowing any multi-family development on the proposed site. Nevertheless, the city approved the preliminary plans.
Meanwhile, the opposition was laboring. On November 21, 1972, a referendum was held whereby the citizens of New Smyrna Beach decided that any future charter amendments to the city's charter would be submitted to the electorate for referendum. On March 20, 1973, a petition allegedly signed by more than 20 percent of the citizens of the city[4] requested that a referendum be held on the following questions:
"Question No. 1: Shall Chapter 22408, Special Acts, Laws of Florida, 1943, be amended so as to add the following section:
"The density of all future development shall be restricted to a maximum of *235 twelve (12) dwelling units per acre in all present and future multi-family zoning classifications.
"Question No. 2: Shall Chapter 22408, Special Acts, Laws of Florida, 1943, be amended so as to add the following section:
"The density of all future development shall be restricted to a maximum of twenty-four (24) dwelling units per acre in all present and future hotel-motel zoning classifications.
"Question No. 3: Shall Chapter 22408, Special Acts, Laws of Florida, 1943, be amended so as to add the following section:
"Ordinance No. 797, being the existing RR-PUD (Resort Residential Planned Unit Development) Ordinance be and the same is hereby rescinded and repealed and all undeveloped properties now carrying this classification shall hereby revert to that zoning classification which applied to said properties immediately prior to the properties being zoned RR-PUD or to the most similar classification thereto now in existence in the City's zoning ordinance."
The city scheduled June 19, 1973, as referendum day. On June 4, 1973, the city's planning board approved Andover's final development plans. The city commission had scheduled final consideration of Andover's development plans for June 12, 1973. Due to the pending referendum, Andover and apparently some of the city fathers were of the view that it would be most practical for Andover to withdraw from the June 12 agenda. On June 19, 1973, the citizens of New Smyrna Beach voted favorably as to each question.
Andover took the position that the referendum did not affect its project. Various officials of the city, the city attorney, and Andover, accompanied by its attorney, negotiated at length in attempting to determine the impact of the referendum on the plans for development of Andover's property. The city attorney finally decided that the subject property would revert back to its original zoning of R-1, single family. Thereafter on August 14, 1973, the city commission passed Ordinance No. 902 whereby it adopted an official zoning map which showed, among other things, Andover's property as being zoned R-1. Andover then proceeded to file the instant suits alleging therein, inter alia, that in reliance upon the RR-PUD zoning of its land and representations of city officials, it had expended large sums of money for engineering, architectural, and attorney's fees, and to acquire the appropriate financing of the subject project.
Unquestionably, the citizens of the City of New Smyrna Beach utilized the process of initiative and referendum to accomplish a rezoning of Andover's tract of land. Such a procedure does not meet the elemental requisites of constitutional due process. In reaching this conclusion we are not unmindful that the City of Coral Gables v. Carmichael[5] decision is the only Florida case that we have found which considered the question of zoning by the procedure of referendum. Although some factual distinction may be gleaned, the basic issue there and in the instant case is the same. Our sister court, in finding that the referendum procedure outlined in City of Coral Gables v. Carmichael comported with due process requirements, relied heavily upon appellate decisions of the State of California. In recent opinions, the California courts have, as a whole, rejected the rationale of City of Coral Gables v. Carmichael. Insofar as the Carmichael case applies to the facts in the instant case, we reject the holding therein.
An excellent analysis of this question, which summarizes the modern view of this matter, is found in Taschner v. City Council of Laguna Beach.[6] There the citizens of Laguna Beach, by the procedure of initiative and referendum, adopted an ordinance restricting building height to three stories not more than 36 feet above the *236 highest point in grade. As a public health and safety predicate, the initiative measure recited that:
"... The people of the City of Laguna Beach hereby find and declare that geologic conditions in the City of Laguna Beach are relatively unstable, that building within the City may be affected by seismic disturbances along the Newport-Inglewood fault, and that the ecology of the City of Laguna Beach is unique and dependent upon the preservation of the natural contours of the hills and the integrity of the shoreline."
The court in striking down the ordinance reasoned:
"It is urged that interested persons can suffer no substantial injury because the election process itself provides the equivalent safeguards afforded by state zoning law procedures. We are unpersuaded. The kind of public debate on the merits of a proposed zoning measure afforded by the election process, including the limited opportunity for the submission of written arguments to the voters, cannot be equated with a dispassionate study, evaluation and report upon the proposal by a staff of planning experts (§ 65804), notice and hearing before the planning commission (§ 65854), written recommendation by the planning commission with reasons for its recommendation (§ 65855), and notice and hearing before the legislative body (§ 65856)
... Moreover the election offers the voters but a single choice, to accept or reject the proposal in its entirety. The legislative body, however, is empowered to modify (as well as approve or reject) a recommendation of the planning commission thereby enabling it to consider and take into account in its actions the legitimate claims and suggestions of those who would be affected by the proposal even though they may represent but a small segment of the electorate.
......
"Our courts have repeatedly declared that due process requires that affected property owners be afforded notice and opportunity to be heard before a local ordinance which substantially affects land use is adopted... .[7] the due process basis of the Hurst decision not only retains its original vigor, our high court has recently given it new emphasis and dimension." (emphasis supplied)
Analogous to the facts in this case are the facts in State v. Donohue.[8] There, the Supreme Court of Missouri reviewed an initiative petition signed by 11,700 citizens and taxpayers seeking to change the boundaries of a parcel of land from heavy industrial to residential. Vigus Quarries alleged that it was the owner of a 225-acre tract in which it had invested $525,000 in developing a quarry business. Vigus acquired the tract in January, 1962. On May 16, 1962, the city council rezoned the tract from single family residence to heavy industrial and granted Vigus a special use to maintain a quarry thereon. Shortly thereafter, respondent procured and filed initiative petitions. The effect of the proposed ordinance was to rezone from heavy industrial to single family residence. The Supreme Court of Missouri, in rejecting the initiative petition, stated:
"The provisions of the St. Louis County charter and ordinances enacted pursuant thereto expressly provide that zoning ordinances may be enacted by the city council, after a public hearing, following public notice published in newspapers and posted signs, consideration of and report by the Planning Commission. The purpose and unequivocal legal import of *237 these provisions are obvious. The ordinance here sought to be enacted by initiative procedure is a zoning ordinance repealing, in effect, the provisions of an amendatory zoning ordinance enacted in accordance with the provisions of the charter. Certainly, hearing and other procedures required and followed in adopting the original amendment cannot be accepted as constituting compliance with a proposed ordinance which would repeal the original amendment." (emphasis supplied)
Forest City Enterprises, Inc. v. City of Eastlake[9] is in point. That case involved the approval by referendum of an amendment to the zoning ordinance. The Ohio Supreme Court, in rejecting the referendum under the facts there recited, stated:
"Due process of law requires that procedures for the exercise of municipal power be structured such that fundamental choices among competing municipal policies are resolved by a responsible organ of government. It also requires that a municipality protect individuals against the arbitrary exercise of municipal power, by assuring that fundamental policy choices underlying the exercise of that power are articulated by some responsible organ of municipal government. McGautha v. California (1971), 402 U.S. 183, 256, 270, 91 S.Ct. 1454, 28 L.Ed.2d 711. The Eastlake charter provision ignored these concepts and blatantly delegated legislative authority, with no assurance that the result reached thereby would be reasonable or rational. For these reasons, the provision clearly violates the due process clause of the Fourteenth Amendment."
Decisions of other states rejecting zoning by the procedure of initiative and referendum emphasize state statutes requiring notice and public hearing to an individual landowner.[10] Those statutes primarily enunciate procedural requirements that meet elemental due process standards mandated by the Constitutions of the State of Florida and the United States of America. We quote with approval the following excerpts from the opinion of the Supreme Court of Oregon in Fasano v. Board of County Com'rs of Washington Cty.:[11]
"At this juncture we feel we would be ignoring reality to rigidly view all zoning decisions by local governing bodies as legislative acts to be accorded a full presumption of validity and shielded from less than constitutional scrutiny by the theory of separation of powers. Local and small decision groups are simply not the equivalent in all respects of state and national legislatures. There is a growing judicial recognition of this fact of life:
`It is not a part of the legislative function to grant permits, make special exceptions, or decide particular cases. Such activities are not legislative but administrative, quasi-judicial, or judicial in character. To place them in the hands of legislative bodies, whose acts as such are not judicially reviewable, is to open the door completely to arbitrary government.' Ward v. Village of Skokie, 26 Ill.2d 415, 186 N.E.2d 529, 533 (1962) (Klingbiel, J., specially concurring).
"The Supreme Court of Washington, in reviewing a rezoning decision, recently stated:
`Whatever descriptive characterization may be otherwise attached to the role or function of the planning commission in zoning procedures, e.g., advisory, *238 recommendatory, investigatory, administrative or legislative, it is manifest * * * that it is a public agency, * * * a principle [sic] and statutory duty of which is to conduct public hearings in specified planning and zoning matters, enter findings of fact  often on the basis of disputed facts  and make recommendations with reasons assigned thereto. Certainly, in its role as a hearing and fact-finding tribunal, the planning commission's function more nearly than not partakes of the nature of an administrative, quasi-judicial proceeding, * * *.' Chrobuck v. Snohomish County, 78 Wash.2d 884, 480 P.2d 489, 495-496 (1971)."
The instant zoning ordinance initiated by the citizens of New Smyrna Beach was in substantial part motivated and directed to the tract of land owned by Andover. The objective was to overrule the fact-finding of the planning commission and its function, and the administrative decision of the city commission. As to Andover's tract, the purported action of the citizens of New Smyrna Beach by the procedure of initiative and referendum violates the basic requisites of constitutional due process and thus is void.
We also conclude that the trial court erred in finding that Andover failed to prove its allegation that the city is equitably estopped from denying it a building permit. The trial court recited in its final judgment extensive findings of fact that Andover had knowledge prior to and at the time it purchased the subject property of substantial opposition to the proposed RR-PUD zoning. Such findings do not vitiate the doctrine of equitable estoppel under the facts of this case. Earlier zoning cases of this jurisdiction created and applied the "red flag doctrine"; that is, if a landowner had good reason to believe that the official mind would change, he could not invoke the doctrine of equitable estoppel. The doctrine is not here applicable for two reasons: 1) the official mind not only did not change, but continuously negotiated with Andover to amend and revise its plans subsequent to approval by the official mind to ameliorate objections of individual citizens, and 2) in Sakolsky v. City of Coral Gables,[12] the the Florida Supreme Court candidly receded from the "red flag doctrine". This court in City of Gainesville v. Bishop[13] applied the doctrine of equitable estoppel even though red flags were soaring. The overwhelming evidence in this case clearly shows that Andover, in relying upon a valid zoning ordinance, expended a large sum of money in purchasing land, planning the use thereof, and with the cooperation of the "official mind" exerted commendable effort to pacify the public protests. The city officials did not yield to the "clamor of the crowd" and, in their efforts to protect the interests of its citizens and the vested rights of Andover, sought to reach a realistic use of the property involved. Deprivation of the legitimate use of a citizen's property is not the proper subject of a town hall meeting. The purported *239 initiative and referendum action was arbitrary and capricious. In addition, the city is estopped from denying Andover a building permit of Phase I pursuant to the city's valid RR-PUD zoning.
Reversed.
BOYER, C.J., concurs.
McCORD, J., dissents.
McCORD, Judge (dissenting).
It is my view that equitable estoppel will not apply unless a building permit has been issued or the applicant has been assured by the city that a building permit will be issued upon compliance with certain prescribed conditions, such as existed in City of Naples v. Crans, Fla.App.2d, 292 So.2d 58 (1974), and City of Miami v. Margulies, Fla.App.3d, 289 So.2d 424 (1974). When that point is reached, an applicant has received authority or an assurance from the city upon which he should be able to rely. In the absence thereof, he proceeds at his peril. Appellant not having reached the stage of final approval for a building permit or approval upon its complying with certain conditions, equitable estoppel in my opinion does not apply.
In addition, I do not agree with the ruling of the majority that zoning may not be accomplished by initiative or referendum. In this respect I agree with City of Coral Gables v. Carmichael, Fla.App.3d, 256 So.2d 404 (1972). There, the court cited with approval the following statement of the Supreme Court in Barnes v. City of Miami, Fla., 47 So.2d 3 (1950):
"`The power of the initiative may be conferred by the state upon a municipal corporation in respect to any matter, legislative or administrative, within the realm of municipal affairs. Where the power of initiative, is given by the legislature it will be generally held to extend to all matters of local concern, unless some matters are expressly or impliedly excluded from its operation by exceptions contained in the charter, the general statutes of the state, or constitutional provisions. See McQuillin, Municipal Corporations, 3rd Ed. pp. 251, 252, Sec. 16.54; * * *'"
The District Court of Appeal, Third District, then went on to point out as follows regarding referendum:
"Although in the above statement in the Barnes case the Court spoke with reference to `initiative', the section of McQuillin on Municipal Corporations, which the Supreme Court cited there as authority had applied the proposition pronounced to `referendum' as well as to `initiative', viz: `The power of initiative or referendum may be conferred by the sovereignty upon a municipality with respect to any matter legislative or administrative, within the realm of local affairs; and often the power, as conferred, is extensive, including all ordinances and resolutions and practically all actions that might be taken by a municipal council.'"
A zoning change accomplished by initiative and referendum after issuance of a building permit or conditional building permit would, however, be subject to the doctrine of equitable estoppel to the same extent as in a case where such change had been made by the city elected body. Here, however, I do not consider that the facts support equitable estoppel. Also, in my view such an ordinance could be attacked on constitutional grounds.
NOTES
[1] The land has as its eastern boundary the Atlantic Ocean and its western boundary the Halifax River (several of the 54 acres lie between the city's bulkhead line and the old mean high water line and are not susceptible to having a building situated on them). To the north of Andover's land is a parcel owned by the U.S. Government which is unimproved except for the U.S. Coast Guard Station which is situated on the Indian River. Along the southwestern boundary of the subject property is a tract of land zoned R-4 permitting multi-family residences. Proceeding along the southern boundary of the disputed property in an easterly direction from this R-4 property is a 13-acre parcel of land zoned single family development which is owned by appellant. Again proceeding easterly along the southern boundary of the disputed land is a series of residential lots which run to the Atlantic Ocean. The residential lot which is immediately adjacent to the southeastern boundary of the subject property is undeveloped.
[2] North Beach Property Owners Association v. City of New Smyrna Beach, 276 So.2d 73 (1 Fla.App. 1973).
[3] In support of its present position, the city advises that the North Beach Property Owners Association filed suit as individuals against the city to declare the instant rezoning invalid and that this suit was voluntarily dismissed when they intervened in the present suit.
[4] Andover attacks the validity of the referendums; however, in view of our holding it is unnecessary to pass upon these points.
[5] City of Coral Gables v. Carmichael, 256 So.2d 404 (3 Fla.App. 1972).
[6] Taschner v. City Council of City of Laguna Beach, 31 Cal. App.3d 48, 107 Cal. Rptr. 214 (1973).
[7] Citing numerous California cases. The California decisions are primarily founded upon the opinion of the California Supreme Court in Hurst v. City of Burlingame, 207 Cal. 134, 277 P. 308 (1929).
[8] State v. Donohue, 368 S.W.2d 432 (Mo. 1963).
[9] Forest City Enterprises, Inc. v. City of Eastlake, 41 Ohio St.2d 187, 324 N.E.2d 740 (1975).
[10] City of Scottsdale v. Superior Court, 103 Ariz. 204, 439 P.2d 290 (1968); Forman v. Eagle Thrifty Drugs & Markets, Inc., 516 P.2d 1234 (Nev. 1973).
[11] Fasano v. Board of County Com'rs of Washington Cty., 507 P.2d 23 (Or. 1973).
[12] Sakolsky v. City of Coral Gables, 151 So.2d 433 (Fla. 1963). There the court stated: "The opinion in the case of Miami Shores Village v. Wm. N. Brockway Post, 156 Fla. 673, 24 So.2d 33, which respondent regards as controlling in its favor, does state that one act at his peril in relying upon a building permit when he is warned by the "red flags" of a political contest in which the success of certain candidates may alter the voting pattern of the governing municipal body. While that case might be distinguished from the one at bar and its conclusion justified on the basis of a number of factual differences, we believe that the rule therepronounced, that an impending change of municipal officers can prevent reliance on an act of the current governing body, is in error and inconsistent with precedent condemning arbitrary action by these public bodies."
[13] City of Gainesville v. Bishop, 174 So.2d 100 (1 Fla.App. 1965).