QUESTIONS: 1. Is approval of W. R. Grace Company's mining site plan to mine Hooker's Prairie by formal vote of the Polk County Commission tantamount to approval of a "subdivision plat" for purposes of vesting under s. 380.06(12), F. S.? 2. Did W. R. Grace Company's development rights to mine Hooker's Prairie vest pursuant to s. 380.06(12), F. S., prior to November 4, 1970? 3. Did W. R. Grace Company's development rights to mine Hooker's Prairie vest pursuant to s. 380.06(12), F. S., as of June 26, 1973? 4. Did W. R. Grace Company's development rights to mine Hooker's Prairie vest pursuant to s. 380.06(12), F. S., after July 1, 1973? 5. Is compliance with the formal permitting procedure under Ch. 380, F. S., required if a development has substantially complied with the purposes and intents of Ch. 380, F. S., and if so, has W. R. Grace Company's subdivision substantially complied with the requirements of Ch. 380?
SUMMARY: Approval by a formal vote of a county board, pursuant to a local subdivision plat law, must occur prior to July 1, 1973, to create a vested right under s. 380.06(12), F. S. The doctrines of nonconforming use and equitable estoppel may be applied to a fact situation created under s. 380.06(12). In this instance, W. R. Grace Company's rights to mine Hooker's Prairie are vested under s. 380.06(12). According to the facts contained in the materials submitted with your request, W. R. Grace Company, hereinafter Grace, intends to mine phosphate on a commercial scale beginning November 1, 1976, at Hooker's Prairie where Grace has substantially completed construction of a phosphate rock processing facility (beneficiation facility). Between 1956 and 1958, Grace explored and determined that economically minable quantities of phosphate existed at Hooker's Prairie. Between 1958 and 1964, Grace acquired fee interests, surface and subsurface mineral mining rights, and an additional 3,890 acres. In December 1970, Grace acquired another 2,388 acres and further acquired an additional 280 acres in January 1975. From 1956 to December 1970, Grace expended: $6,612,558 for land acquisition; $321,348 for prospecting; $160,000 for engineering and development work; and $20,000 for miscellaneous expenditures. From January 1971 to July 1, 1973, Grace expended $1,731,360 for land acquisition and $32,000 for engineering and development work. Since 1963, Grace has prepared engineering details, mining plans, cost estimates, and other activities for mining and production commencement in July 1968. Due to market conditions, production was not started. Grace has substantially all required permits and approvals for operation. The Polk County Board of Commissioners adopted, on October 30, 1970, Protective Development Regulations which were approved by referendum on November 4, 1970. The county board, on June 26, 1973, approved Grace's mining site plan for Hooker's Prairie as an amendment to another existing site plan. On September 26, 1973, Grace was advised by the Division of State Planning (DSP) that the beneficiation facility was not a development of regional impact (DRI). The Division of State Planning notified Grace of its DRI reconsideration in August 1975. Grace contended that its rights had vested under s. 380.06(12), F. S., and the county board resolved that Grace's rights had vested in June 1973. Question 1 is answered in the negative. Section380.06(12), F. S., defines vesting as it pertains to subdivision plats: [A]pproval pursuant to local subdivision plat law, ordinances, or regulations of a subdivision plat by formal vote of a county . . . having jurisdiction after August 1, 1967, and prior to July 1, 1973, shall be sufficient to vest all property rights for the purposes of this subsection . . . . The statute enumerates two criteria required for vesting: Approval must be given pursuant to local subdivision plat law; and such approval must be by a formal vote of the governmental (county) body after August 1, 1967, and prior to July 1, 1973. Your letter and attachments thereto reveal that Grace has not applied for or been given approval in any form pursuant to the Polk County subdivision plat ordinance. This county ordinance is in fact a resolution of the Polk County Board dated August 10, 1971, pursuant to the authority of Ch. 57-1746, Laws of Florida. The resolution relates to the platting and development of residential subdivisions, which is evidenced by the regulations incorporated therein. As referenced above, the county board formally approved the mining site on June 26, 1973. On December 9, 1975, the commission attempted, by formal vote, to state that the June 26, 1973, vote had vested Grace pursuant to their subdivision plat law. It is my opinion that this vote is of no effect, as it is after the statutory cutoff. Question 2 is answered in the affirmative. Section 380.06(12), F. S., in essence provides that if a local government (county) would be prevented from effecting vested or other legal rights, "nothing in this chapter authorizes any government agency to abridge those rights." To ascertain whether or not the local governmental agency could have affected the Grace rights on November 4, 1970, application of the doctrine of nonconforming use is required. Generally, the right of a landowner to continue the nonconforming use of property applies only to a nonconforming use which existed at the time of the promulgation of the ordinance or regulation prohibiting such use. Fortuano v. The City of Coral Gables,47 So.2d 321 (Fla. 1950); 101 C.J.S. Zoning s. 184. A nonconforming use which is merely contemplated or intended but not realized as of the effective date of the zoning regulation prohibiting such use is generally not protected as a nonconforming use. 101 C.J.S. Zoning s. 185. To determine whether the construction or use will be regarded as a nonconforming one depends upon the sufficiency of the activity in progress at the time of the enactment of the ordinance. 101 C.J.S. Zoning s. 90. Structures or uses in the course of construction at the time of the enacting of zoning regulations prohibiting such use may be regarded as nonconforming uses. Bemas Corp. v. City of Jacksonville, 298 So.2d 467 (1 D.C.A. Fla., 1974). I have found no Florida case that specifically expresses criteria to ascertain the amount of activity required to establish a nonconforming use. In Bemas, supra, however, the court found a nonconforming use when a city adopted an ordinance prohibiting a contemplated borrow pit operation. The ordinance required actual commencement of activities to avoid the prohibitions of the ordinance. The Bemas Corporation, to comply with the ordinance, rushed the closing of contractual negotiations and removed and sold ten truck loads of dirt prior to the ordinance's effective date. The trial court held that such acts were not sufficient and determined that a nonconforming use did not exist. The appellate court reversed and stated: When all the evidence is considered, there leaves no doubt that the property was bought for the borrow pit purpose, nor any doubt that the buyers were doing their best to get in before the change in the Ordinance took effect. The evidence clearly shows the intent of the buyers to start a borrow pit. The Ordinance only provides that the operation be commenced. . . . The evidence of the attempt and intent to commence the borrow pit operation seems to us to be clear and undisputed. Only so much can be done in the last moment rush to come under the wire. [298 So.2d at 468.] Courts of other states have set forth appropriate tests. The Kentucky Court of Appeals, in Darlington v. Board of Councilmen of City of Frankfort, 140 S.W.2d 392 (Ky.App. 1940), when faced with the issue of whether a nonconforming use had been established, stated: Obviously, it is not the amount of money expended which determines the vesting of the right, since one property owner might be required to expend more in the preliminary steps of altering his property for the conduct of a particular business than his neighbor would be compelled to expend in completing the alteration of his property for a different type of business. On the other hand, the mere ownership of property which could be utilized for the conduct of a lawful business does not constitute a right to so utilize it which cannot be terminated by the enactment of a valid zoning ordinance, as such a concept involves an irreconcilable contradiction of terms. "It would seem, therefore, that the right to utilize one's property for the conduct of a lawful business not inimicable to the health, safety, or morals of the community," becomes entitled to constitutional protection against otherwise valid legislative restrictions as to locality, or, in other words, becomes "vested" within the full meaning of that term, when, prior to the enactment of such restrictions, the owner has in good faith substantially entered upon the performance of the series of acts necessary to the accomplishment of the end intended. [140 S.W.2d at 396; emphasis supplied.] See also Smith v. Juillerat,119 N.E.2d 611 (Ohio 1954). Two other cases decided outside of this jurisdiction are helpful in the resolution of this issue. The first, Blundell v. City of West Helena, 522 S.W.2d 661 (Ark. 1975), found a nonconforming use at plaintiff's mobile home park where the plaintiff had paved the streets and made water and sewer service available. The court did make a distinction as to the balance of the mobile home park where nothing had been done other than the mere purchase of land, calling it a long-range future plan and, therefore, not sufficient to be a nonconforming use. In Perkins v. Joint City-County Planning Comm'n, 480 S.W.2d 166 (Ky. 1972), the court concluded that actual conversion of a motel had commenced and rights were protected. Approximately $12,000 of a $128,000 total expenditure necessary to accomplish the finished product has been paid out. The test as set forth above is not the intent of the development plan, but the actual implementation, the entering upon a series of acts necessary to accomplishment of the intended goal. The facts submitted reveal that as of November 4, 1970, the applicant in good faith substantially entered upon the performance of a series of acts necessary to accomplish the intended goal. It is noted that previously Grace purchased extensive mineral rights to enable it to extract those minerals for which Grace expended over $500,000 in prospecting and related engineering studies. Grace had expended approximately 75 percent of the funds necessary to accomplish the intended goal. Grace had also drained much of the property and constructed roads for the purpose of access to the mineral locations. These activities and expenditures cannot be isolated from the prospecting and engineering studies performed and the expenditure of approximately $7,000,000. Moreover, Grace was prepared to actually mine parts of the minerals as early as 1967. In addition, s. 380.06(12), F. S., does not require actual commencement of operations to establish a nonconforming use. Therefore, it is my opinion that, under the facts submitted, Grace has substantially entered upon the performance of a series of acts necessary to the accomplishment of the intended goal. Grace is vested, pursuant to s. 380.06(12), F. S., and is not required to comply with the other requirements set forth in Ch. 380, F. S. Question 3 is answered in the negative. Section 380.06(12), F. S., vests such rights no later than July 1, 1973, the act's effective date. The county board issued the mining site approval on June 26, 1973, and could have rezoned the property until July 1, 1973. The county board and the Division of State Planning are estopped from affecting Grace's rights since Grace is within the s. 380.06(12) exemption. In Andover Development Corp. v. City of New Smyrna Beach, 328 So.2d 231 (1 D.C.A. Fla., 1976), the court found that, prior to the closing and for several months thereafter, Andover worked with various city officials on various aspects of developing the subject property and in devising an amended development plan for the land. On February 12, 1973, 1 year after the purchase of the property, Andover presented its preliminary development plan to the city planning board and was given approval. The following month the city commission approved the preliminary plan. Thereafter the citizens of New Smyrna Beach by initiative and referendum changed the zoning ordinance and forced the city to rezone the property back to its original zoning. Andover filed suit alleging that the initiative and referendum was unconstitutional upon the estoppel doctrine to which the court agreed: The overwhelming evidence in this case clearly shows that Andover, in relying upon a valid zoning ordinance, expended a large sum of money in purchasing land, planning the use thereof, and with the cooperation of the "official mind" exerted commendable effort to pacify the public protests. The city officials did not yield to the "clamor of the crowd" and, in their efforts to protect the interests of its citizens and the vested rights of Andover, sought to reach a realistic use of the property involved . . . the city is estopped from denying Andover a building permit of Phase I pursuant to the city's valid RR-PUD zoning. [328 So.2d at 238, 239; emphasis supplied.]
A similar result was reached in Town of Largo v. Imperial Homes Corp., 309 So.2d 571 (2 D.C.A. Fla., 1973). Imperial contracted to purchase 25 acres of property for approximately $200,000 which was zoned without restrictions. The sale was contingent upon obtaining zoning which would authorize multi-family development. In December 1968, the town approved rezoning to allow such development. A year later, an additional 16 acres was purchased by Imperial based on notification by the town that multi-family development was permissible. In a meeting held in January 1972, the town and Imperial agreed to limit the development to 39 units per acre. Imperial further agreed to actually limit the construction to only 24 units per acre and further agreed to use the second tract for only recreational purposes. In May 1972, the town commission voted to rezone the property to two and a half units per acre. The appellate court stated that the existence of a building permit and the making of a physical change is not to be a condition precedent to application of the doctrine of equitable estoppel. The court set forth the elements that "when a property owner: (1) relying in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights he has acquired." The town was estopped from changing the zoning. Based upon the facts set forth above and the actions of the county board I am of the opinion that Grace relied upon the inducements and acts of the county board, which it complied with. Board of City Commissioners of Metropolitan Dade v. Lutz, 314 So.2d 185 (3 D.C.A. Fla., 1975); City of North Miami v. Margulies, 289 So.2d 424 (3 D.C.A. Fla., 1974). Therefore, Grace is within the protection of s. 380.06(12), F. S. Question 4 is answered in the negative. Section 380.06(12), F. S., contains no provision for vesting after July 1, 1973. The doctrine of equitable estoppel is, however, applicable to DSP. Texas Co. v. Town of Miami Springs, 44 So.2d 808 (Fla. 1950). The Division of State Planning on September 6, 1973, notified Grace that the construction of the beneficiation facility was not a development of regional impact. This action was done pursuant to a request by Grace for a binding letter. Grace may, therefore, assert that the mining site is included within the beneficiation facility's binding letter and, since there are substantial expenditures after September 6, 1973, that the doctrine is applicable. The binding letter for the beneficiation facility was requested pursuant to Ch. 22F-2.05, F.A.C., which relates to industrial plants. The letter was not requested under Ch. 22F-2.06, F.A.C. which relates to mining sites. As to the beneficiation facility, DSP would clearly be estopped to prevent the completion of or use of the facility. However, the binding letter clearly indicates that even the expansion of the plant's parking lot would void the binding letter and make the facility fall within the statutory definition of a DRI. Since the binding letter was requested and issued pursuant to 22F-2.05, F.A.C. (industrial plants), it is my opinion the doctrine of equitable estoppel would not apply to the division as to the mining site. Question 5, first part, is answered in the affirmative. Unless an applicant is exempt under s. 380.06(12), F. S., the applicant must comply with the requirements of Ch. 380, F. S. There are no references, direct or implied, for the proposition that substantial compliance with any other regulation would exempt a developer from complying with the formal permitting procedures. Nor have I found any Florida case law to support the doctrine of substantial compliance. Therefore, it is my opinion that the doctrine is inapplicable. Since compliance with the formal permitting procedures is required, there is no necessity for me to express an opinion as to the second part of question 5.