# CIRCUIT COURT OF THE CITY OF NORFOLK

Committee of Petitioners,
*ex rel.* Lewis J. Taylor, et al.

v.

City of Norfolk

February 6, 2015

Case No. (Civil) CL14-4778

By Judge Junius P. Fulton, III

The current litigation raises concerns regarding the right of citizens to a referendum and the City of Norfolk's power to establish zoning classifications. In the balance rests the ultimate disposition of what is widely considered to be a historically significant property dating back to the earliest years of the City, Talbot Hall.

Between 1799 and 1802, Solomon Talbot built Talbot Hall for his son, Thomas. On the property, Thomas planted two tree lines to align with the position of the sun on the summer and winter solstice yard. Subsequently, in 1954, the Talbot Hall property (the "Property") was donated to the Episcopal Diocese of Southern Virginia ("the Diocese").

Some time prior to March 2014, the Diocese entered into a contract to sell the Property to Talbot Hall West, L.L.C. ("the LLC"). The members of the LLC consist of private individuals seeking to build single-family homes on the Property. However, because the Property was zoned "institutional," a zoning classification incompatible with the purchaser's plans for residential development, the contract is conditioned upon the Property being rezoned residential. Consequently, on June 24, 2014, the Norfolk City Council adopted three Ordinances ("the Ordinances") rezoning the parcel and allowing the development of fourteen single family homes. The Council also made them effective immediately, pursuant to Section 15 of the Norfolk City Charter ("the Charter").

The dispute at hand has arisen because the Talbot Hall Foundation, a group formed to promote the preservation of Talbot Hall, believes that the rezoning fails to preserve the integrity of Talbot Hall in its historic setting by placing home sites between the house and the Lafayette River. Apparently, the Foundation's discontent focuses on the loss of a full panoramic or "solstice" access to the water from the porch of Talbot Hall to the river. (Letter from Samuel J. Webster, counsel for the Diocese, to Marcus D. Jones, City Manager, City of Norfolk. (Sept. 4, 2014).) Soon after the Council approved the rezoning of the Property, members of the Foundation formed the Committee of Petitioners ("the Committee") to initiate a referendum to repeal the rezoning ordinance. Pursuant to Va. Code § 24.2-684.1, the petition calling for a referendum was properly filed with this Court and awaits determination that it is legally valid and thus a referendum should be ordered.

In response to the referendum petition, the Diocese sent a letter to the city manager informing him that it would demolish the manor house if the referendum succeeds in repealing the Ordinances. (Letter from Samuel J. Webster, counsel for the Diocese, to Marcus D. Jones, City Manager, City of Norfolk, (Sept. 4, 2014).) On September 9th, the city manager issued a certification, pursuant to Section 40 of the Charter, claiming that the Ordinances are necessary to protect the City from an imminent loss and consequently are not subject to a referendum. (Letter from Marcus D. Jones, City Manager, City of Norfolk, to Council, City of Norfolk, (Sept. 9, 2014).)

Armed with the certification under Section 40, the City filed a Motion to Intervene to contest the Committee's right to a referendum to repeal the Ordinances. That motion was granted by this Court on November 24, 2014, and the City filed the present motions challenging the right to a referendum. It should be noted that, the Committee's procedural compliance with City's Charter referendum provisions remain unchallenged.

Most recently, on January 13, 2015, the Court heard testimony and argument in support and opposition to the City's Motion for Summary Judgment, Plea in Bar, and Motion to Dismiss.

Essentially there are two issues implicated by the outstanding motions:

(1) Whether the law permits the use of a referendum to repeal an effective ordinance rezoning private property; and

(2) If the law allows a referendum, whether the City's certification under Section 40 exempts these ordinances from referendum.

After due consideration of the evidence adduced at the hearing, the argument of counsel, and the applicable statutes and case law, I find that the City's Motions for Summary Judgment, Plea in Bar, and Dismissal must be denied for the following reasons.

*Summary Judgment*

The City's Motion for Summary Judgment asserts that the Ordinances are "exempted by law" from the referendum process provided for in the Norfolk City Charter. It argues that the power to determine zoning classification rests exclusively with the City and cannot be properly delegated to the citizens via a referendum. To be entitled to summary judgment, the City must show that no "material fact is genuinely in dispute." Va. Sup. Ct. R. 3:20. A trial court considering a motion for summary judgment must "accept as true those inferences from the facts that are most favorable to the non-moving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88, 677 S.E.2d 272 (2009) (*citing Dickerson v. Fatehi*, 253 Va. 324, 327, 484 S.E.2d 880 (1997); *Carson v. LeBlanc*, 245 Va. 135, 139-40, 427 S.E.2d 189 (1993)).

The City's challenge begins with the zoning enabling statutes. The City contends that a "review of the overall scheme of the enabling statutes reveals that the power to control the uses of private land by the imposition of zoning districts and their concomitant rules resides exclusively with the locality's governing body."

The Court finds this argument unpersuasive because the Supreme Court of Virginia has already rejected a similar argument in *R. G. Moore Bldg. Corp. v. Commonwealth*, 239 Va. 484, 488, 391 S.E.2d 587 (1990). In *R. G. Moore*, "[t]he landowner contend[ed] that zoning is a legislative power delegated by the General Assembly exclusively to the local governing bodies to be exercised only by duly enacted ordinances. Repeal of properly passed zoning ordinances, the landowner contend[ed], violates that exclusive power." There, just as the City argues in this case, the landowner argued that "[d]uly enacted zoning regulations cannot be amended by a referendum process which lacks explicit zoning procedures." *Id.* at 488.

The Supreme Court of Virginia rejected this argument and explained that referendum provisions do not involve an improper delegation of legislative power to the electorate. *Id.* at 489. "Rather, there is a valid reservation by the people of the traditional right of referendum." *Id.* at 489. Moreover, the Court found "there [is] nothing 'fundamentally unfair' in the referendum process to landowners [and] relief by variance is potentially available if hardship results when a property owner's land use changes are rejected by the voters." *Id.* at 493 (*quoting City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 679, n. 13, 96 S. Ct. 2358, 49 L. Ed. 2d 132 (1976)).

The City further argues that the referendum process undermines the notice procedures in Title 152 of the Code of Virginia applicable to zoning and thus violates due process. Interestingly, the landowner in *R. G. Moore* made, essentially, the same argument when he claimed that it was " 'fundamentally unfair' for it to be required to 'weather the myriad procedural rules and hearings set out in the zoning code and then face the

misinformed electorate without an opportunity to present its case'." *R. G. Moore Bldg. Corp.*, 239 Va. at 493.

In *R. G. Moore*, the Court rejected this argument ruling, "[a]s a basic instrument of democratic government, the referendum process does not in itself violate the Due Process Clause ... when applied to a zoning ordinance." *Id.* at 493 (*quoting City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 679, 96 S. Ct. 2358, 49 L. Ed. 2d 132 (1976)). The Court reasoned that "there was nothing 'fundamentally unfair' in the referendum process to landowners, relief by variance is potentially available if hardship results when a property owner's land use changes are rejected by the voters." *Id.* at 493 (citing *City of Eastlake*, 426 U.S. at 679, n. 13).

Next, the City argues that *R. G. Moore* specifically prohibits the Petitioners' right to a referendum. In *R. G. Moore*, a landowner sought to rezone his land in Chesapeake from agricultural to single family residential. *Id.* at 486. The Chesapeake City Council approved the petition and rezoned the land. *Id.* at 486. Following the approval, a group of concerned citizens mounted a petition drive to return the property to its former zoning status pursuant to § 3.07 of the Chesapeake City Charter. *Id* at 486. Section 3.07 provided in relevant part:

> No ordinance, unless it be an emergency measure as herein defined, or the annual appropriation ordinance, shall become effective until thirty (30) days after its final passage. If a petition ... requesting that such ordinance be repealed or amended as stated in the petition, such ordinance shall not become effective until the steps provided for herein shall have been taken.

*Id.* at 490. The Court explained:

> The operation of the charter provision likewise is clear and unequivocal. The referendum held pursuant to § 3.07 technically does not "repeal" an ordinance; the ordinance never becomes effective. The referendum only serves to ratify or reject action taken by elected representatives which has not yet become effective. The original zoning on the landowner's property remains in place; the landowner is merely prevented from obtaining a new use for the land in a different zoning classification. The referendum provisions can never be used to rezone property, so the anticipated danger of "piecemeal" alterations to the City's comprehensive plan does not exist.

*Id.* at 490.

The City argues that "[a] careful reading of the *R. G. Moore* opinion leads one to conclude that, had the [R. G. Moore] rezoning already been

in effect, the referendum likely would not have been allowed to go to election." The City highlights the language employed by the Court when it opined: "The referendum provisions can never be used to rezone property," because of "the anticipated danger of 'piecemeal' alterations to the City's Comprehensive Plan... ." *R. G. Moore Bldg. Corp.*, 239 Va. at 490.

However, in *R. G. Moore*, the Court allowed the referendum, reasoning that the referendum held pursuant to the Chesapeake Charter "technically does not 'repeal' an ordinance; the ordinance never becomes effective." *Id.* at 490, 391 S.E.2d at 590. "The referendum only serves to ratify or reject action taken by elected representatives which has not yet become effective." *Id.* at 490.

In that case, the Chesapeake Charter stated:

> No ordinance, unless it be an emergency measure as herein defined, or the annual appropriation ordinance, shall become effective until thirty (30) days after its final passage. If a petition ... requesting that such ordinance be repealed or amended as stated in the petition, such ordinance shall not become effective until the steps provided for herein shall have been taken.

*Id.* at 490.

In contrast, Section 15 and Section 40 of the Norfolk City Charter allow these Ordinances to remain effective from the date of passage through the referendum process. The repeal of an effective ordinance, however, fails to rezone the property as contemplated by *R. G. Moore*. Indeed, it only serves to ratify or reject action taken by elected representatives.

Contrary to the City's argument, the distinction between rezoning and repealing is legally significant. Generally, a court must look to the actual consequences sought by the filing of a petition. *See Collins v. City of Norfolk*, 244 Va. 431, 434-35, 422 S.E.2d 782 (1992). In Collins, the Court found the distinction between passing of an appropriations ordinance and repealing two lines of that appropriations ordinance to be legally insignificant. The Court ruled that both passing an ordinance and repealing an ordinance "are legislative in nature and effect." *Id.* at 434.

Most importantly, a referendum repealing a zoning ordinance fails to present the danger of "piecemeal alterations to the City's comprehensive plan" as argued by the City. Indeed, a referendum to repeal can only do two things: (1) keep Talbot Hall "single-family residential;" or (2) revert the property back to "institutional."

In contrast, a referendum to rezone property could provide for disjointed changes to private land not previously contemplated by the City Council. For example, a referendum to rezone could change Talbot Hall from "single-family residential" to "agricultural." Clearly, *R. G. Moore* expressed concern over this type of situation because the City Council would never

have contemplated an "agricultural" zoning on that land. Merely repealing a zoning ordinance, however, cannot bring about this unexpected change.

Admittedly, a referendum does carry consequences for developers. Since the law appears to allow the Ordinances to remain effective during the referendum process, the LLC could continue developing the property up until the conclusion of the referendum. In the event of a successful repeal, all changes operate prospectively. Such a situation could leave the LLC empty handed after significant investment has been made.

However, this risk fails to present the dangers argued by the City because the Charter limits the possibility of a referendum to a thirty day period following adoption of the Ordinances. After that period passes, the threat of a referendum disappears. Furthermore, the filing of a petition puts the landowner on notice that their property is subject to a referendum. During the pendency of the referendum, the landowner knows that a successful referendum could undermine future development goals. Accounting for this risk, a prudent developer would wait until the completion of the referendum process to undertake the project.

The real concern with piecemeal alterations arises when a rezoning makes unsystematic or partial zoning changes to the land. Here, the referendum only seeks to repeal the Ordinances. A successful repeal merely reverts the property back to its previously zoned state.

Given the distinctions to be drawn between the Norfolk City Charter and the Chesapeake Charter at issue in *R. G. Moore* and the lack of any Virginia cases directly addressing whether effective ordinances are subject to referendum, the Court necessarily looks to other jurisdictions for guidance.

For example, in *Witkin Homes, Inc. v. Denver*, 31 Colo. App. 410, 504 P.2d 1121 (1972), a Colorado Court found that citizens can use a referendum to repeal zoning ordinances already in effect.

In addition to *Witkin Homes, Inc.*, a number of jurisdictions have addressed the issue of whether land use decisions are subject to referenda. The annotation, "Adoption of Zoning Ordinance or Amendment Thereto as Subject of Referendum" 72 A.L.R.3d 1030, 392 Mich. 458, 221 N.W.2d 303 (2015), provides helpful analyses of the cases on this subject. In many cases, the issue presented turns on the construction of the disparate provisions of the constitutions and statutes of the various states. As one court aptly stated:

> On the one hand, the public policy underlying the right to a voter referendum would apply that right to almost all government actions that affect citizens in vital areas of concern, including the enactment and change of zoning laws and ordinances. On the other hand, the importance of professional expertise and community-wide perspective in zoning matters, given effect in common requirements for public hearings, planning commission recommendations, and the establishment of

comprehensive plans, weighs against the piecemeal changes that can result from allowing voters to veto zoning actions by referenda. Whatever the merit of these contrasting policies, they are not applied in the abstract, but against the background of the various constitutional provisions and statutes each state has adopted on the subjects of zoning and referendum.

*Wilson v. Manning,* 657 P.2d 251, 252 (Utah 1982).

With this caveat in mind, a majority of jurisdictions hold that a general zoning enactment or an action of the local governing body in rezoning a plot of land is subject to the referendum process. 6-89 *Antieau on Local Government Law,* Second Ed., § 89.06.

According to *Antieau,* § 89.06, at n. 27, the following jurisdictions allow the use of a referendum to rezone property.

Colorado: *Citizens for Quality Growth Petitioner's Comm. v. City of Steamboat Springs,* 807 P.2d 1197 (Colo. App. 1990); *Margolis v. District Court,* 638 P.2d 297 (Colo. 1981). Zoning and rezoning are legislative acts, subject to referendum. *Fort Collins v. Dooney,* 178 Colo. 25, 496 P.2d 316 (1972); *Witkin Homes v. Denver,* 504 P.2d 1121 (Colo. App. 1972).

Florida: *Coral Gables v. Carmichael,* 256 So. 2d 404 (Fla. Dist. Ct. App. 1972), *overruled in part, Andover Dev. Corp. v. New Smyrna Beach,* 328 So. 2d 231 (Fla. App. 1976); *City of Winter Springs v. Florida Land Co.,* 413 So. 2d 84 (Fla. Dist. Ct. App. 1982), *aff'd,* 427 So. 2d 170 (1983).

Michigan: *Chynoweth v. City of Hancock,* 107 Mich. App. 360, 309 N.W.2d 606 (1981). Amendatory zoning is a legislative act, subject to referendum. *Reva v. Township of Portage,* 356 Mich. 381, 96 N.W.2d 778 (1959); *Stadle v. Township of Battle Creek,* 346 Mich. 64, 77 N.W.2d 329 (1956).

Minnesota: *Denney v. Duluth,* 295 Minn. 22, 202 N.W.2d 892 (1972).

Ohio: *Hilltop Realty, Inc. v. City of S. Euclid,* 110 Ohio App. 535, 82 Ohio Law Abs. 417, 164 N.E.2d 180, *appeal dismissed,* 170 Ohio St. 585, 166 N.E.2d 924 (1960). An amendatory zoning ordinance is subject to referendum.

Virginia: *R. G. Moore Bldg Corp. v. Commonwealth,* 239 Va. 484, 391 S.E.2d 587 2034 (1990).

The City argues that courts in Michigan, South Carolina, South Dakota, Utah, Nebraska, and Washington support the proposition that citizens cannot use a referendum to rezone property. However, most of the cases cited by the City have been distinguished, modified, criticized, or overruled. *Korash v. City of Livonia,* 388 Mich. 737, 746, 202 N.W.2d 803, 808 (1972); *see Jacobs, Visconsi & Jacobs Co. v. City of Burton,* 108 Mich. App. 497, 501-02, 310 N.W.2d 438, 440 (1981); *I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 415, 526 S.E.2d 716, 720-21 (2000), *criticized in Garvin v. Ninth Judicial District Court of the State of Nevada,* 118 Nev. 749, 764, 59 P.3d 1180, 1190 (2002); *Cary v. Rapid City,* 1997 S.D. 18, 20-23, 559 N.W.2d

891, 895 (1997). However the citizens' right to utilize the referendum process to rezone property was approved in *Taylor Properties, Inc. v. Union County*, 1998 S.D. 90, 583 N.W.2d 638 (1998); *Wilson v. Manning*, 657 P.2d 251, 254 (Utah 1982), *repudiated in Carter v. Lehi City*, 2012 Utah 2, 269 P.3d 141 (2012); *Kelley v. John*, 162 Neb. 319, 324, 75 N.W.2d 713, 716 (1956), *overruled in Copple v. City of Lincoln*, 210 Neb. 504, 507, 315 N.W.2d 628, 630 (1982); *Leonard v. City of Bothell*, 87 Wash. 2d 847, 853-54, 557 P.2d 1306, 1310-11 (1976).

Lastly, the Norfolk City Charter adopted by the Virginia General Assembly specifically allows a referendum to repeal an ordinance. "We must assume that the General Assembly chose, with deliberation and care, the words it employed in the statute." *Miller v. Highland County*, 274 Va. 355, 364, 650 S.E.2d 532 (2007) (citations omitted). Here, the General Assembly used the word "repeal." "Repeal" means "to abrogate an existing law." *Black's Law Dictionary* 1413 (9th ed. 2009). "Rezone" means "[t]o change the zoning boundaries or restrictions of (an area). *Black's Law Dictionary* 1435 (9th ed. 2009). Certainly, the power to change the zoning boundaries or restrictions of an area can threaten the City's long term planning goals. In contrast, abrogation implies a return to the *status quo* without the danger of unsystematic or partial zoning changes to the land.

The Court concludes that the terms repeal and rezone are not synonymous or interchangeable and do not result in the same consequences. Consequently, the City's Motion for Summary Judgment will be denied.

### *Plea in Bar*

In asserting its Plea in Bar, the City argues that certification under Section 40 exempts these Ordinances because they are immediately necessary to protect the City from imminent loss. The City relies upon a letter from the Diocese to the city manager which prompted the certification. In that letter, the Diocese claims that the "referendum petition makes the Manor House an albatross around any sale of the property" and the Diocese "has no choice but to demolish the structure." (Letter from Samuel J. Webster, counsel for the Diocese, to Marcus D. Jones, City Manager, City of Norfolk, (Sept 4, 2014).) The testimony adduced at the hearing provided further support that, barring the sale, the Diocese would be forced to demolish the structure.

The City reasons that it must exercise its authority "to protect the City against the improper use of private property to the injury of the public interest… ." Moreover, the "manor house is a shining example of the sorts of resources that the City seeks to protect through its zoning regulations" and that "the permissions and requirements of the Ordinances provide for work and improvements that are immediately necessary to protect the City from losing the manor house — the type of historic structure that can be protected by zoning regulation because of the interest that the public has in its survival."

Under the circumstances of this case, I find that the City has failed to validly certify these Ordinances as Section 40 measures. Section 40 allows "[o]rdinances passed providing for any work, improvement, or repairs certified by the city manager to be immediately necessary … to protect the city from imminent loss … shall not be subject to the referendum." Norfolk City Charter, § 40.

Here, the city manager's certification states that the Ordinances "require the preservation of the Talbot Hall Manor House" and "are immediately necessary to protect the City from the imminent loss of these important assets." Nothing in the Ordinances provide for any work, improvements, or repairs.

The Committee argues that these Ordinances cannot be Section 40 measures because the certification came only after the Council passed the Ordinances. The Committee complains that "the timing of the certification shows that the certification served as a strategic maneuver, rather than a *bona fide* attempt to certify a Section 40 measure." Perhaps this is true, but nothing in the text of Section 40 mandates certification prior to or contemporaneous with the passage of the Ordinance.

The Committee also argues that Section 40 requires that certifications must "protect … the City from imminent loss." In a broad sense, the preservation of the Manor House prevents the loss of an aesthetic, cultural, and historical resource of the City. As a result, one can reasonably argue that the Ordinance protects "the City" from imminent loss. The Committee claims that the legal rights and resulting legal injuries belong to and fall upon the Manor House's owners and purchasers, not the City. Unfortunately, the scope of Section 40's authority to "protect the City" remains uninhibited by court precedent. Whether protecting a privately owned historic antebellum farm home actually protects the City from imminent loss is a question of first impression and need not be addressed here.

Determination of the applicability of Section 40 certification in this case turns on the language employed in the Charter. The Charter limits Section 40 measures to "[o]rdinances passed providing for any work, improvement, or repairs." *Webster's Dictionary* defines "providing" as "to supply means of support."

Here, the Ordinances gave no "means of support" to protect the City from imminent loss. Instead, the Ordinances merely gave a private developer the opportunity to restore the property. Two factors support this conclusion. All of the previously filed certified measures allowed the City to borrow money to pay for necessary work, improvements, or repairs. Additionally, the last clause of Section 40 provides that "such measures so repealed shall be deemed sufficient authority for payment in accordance with the ordinance of any expenses incurred previous to the ascertainment and certification by the commissioner of election of the result of the referendum vote thereon."

A scenario which is not applicable here as the expense will be borne by a private developer.

Indeed, Section 40 contemplates a scenario where the City must pass an ordinance for the repair of crucial infrastructure, for example, a deteriorating bridge. Clearly, such an ordinance should be exempt from the referendum process because a damaged bridge represents a danger to the public. In that situation, the City needs a mechanism to block the harmful delays a referendum would cause.

In this case, these Ordinances simply fail to "provide for any work, improvement, or repairs" by the City of Norfolk. Allowing a private developer the opportunity to make repairs on private property fails to qualify for a Section 40 exception from the referendum process.

The City's assertion of a Plea in Bar presents a distinct issue of fact which, if proven, creates a bar to the Committee's right to seek repeal of the zoning Ordinances in question by referendum. As the moving party, the City has the burden of proof on this issue. *Hilton v. Martin*, 275 Va. 176, 177, 654 S.E.2d 572 (2008). However, the facts as developed in the testimony presented at the hearing and the pleadings and exhibits thereto do not meet that burden, and the Plea in Bar must be overruled.

Given the policy considerations implicated by this litigation, it seems beneficial to take a closer look at some possible criticisms. Some believe that subjecting land use decisions to popular election results in the following issues: (1) voters do not get the information they need to make an informed decision; (2) voters do not have the expertise to make land use decisions; (3) voters do not genuinely balance the public interest with their personal interests; (4) direct democracy threatens to interfere with comprehensive planning goals; and (5) a referendum conflicts with zoning enabling statutes.

One scholar believes the case against direct democracy is far less one-sided than previous critics believed. Daniel P. Selmi, "Reconsidering the Use of Direct Democracy in Making Land Use Decisions," 19 *UCLA J. Envtl. L. & Pol'y* 293 (2002). First, voters receive sufficient information to make an informed decision. Since referenda challenge a legislatively approved action, the record before the legislative body when it took that action will be available to voters. Moreover, the small scale of a local elections makes it easier to disseminate the information to the voters. For instance, block meetings or civic associations help get the message out. Additionally, local newspapers are likely to cover controversial referenda votes carefully and in some depth.

Second, voters possess the requisite intelligence to make informed land use decisions when dealing with the rezoning of a single property like this one. Under this scenario, the evaluation fails to command special expertise. While the electoral process may simplify issues to appeal to voters, the assumption that land use planners employ high level expertise for every land use decision may be overstated. Thus, the actual loss of expertise may

not be nearly as great as those who object to the use of direct democracy through a referendum.

Third, voters weigh competing interests as well, if not better than, elected officials and planners. The normal land use process does not employ technical expertise in the idealized fashion that critics of direct democracy assume. Instead, some observers believe, rightly or wrongly, that due to politicization, planners have become overly favorable to development requests. Indeed, direct democracy provides a check on the decision making process that can be viewed as skewed because of a perceived structural pro-growth imbalance in local government.

Fourth, whether direct democracy interferes with the comprehensive plan of a city must be determined by the courts and turn on the facts of each case. Here, the referendum seeks to repeal a rezoning ordinance that changed the Property from institutional to residential. The repeal of the ordinance merely returns the property to its original state, thus, eliminating fears of spot zoning or piecemeal alterations to the City's comprehensive plan.

Lastly, a referendum fails to conflict with a state's zoning scheme. Rather, a referendum merely challenges a land use decision that the local government already considered and approved through its normal processes. Thus, the referendum is not inconsistent with planning procedures required by state law in the sense that the referendum does not prevent these procedures from taking place.

Despite the cultural, aesthetic, and historical significance of the Talbot Hall property, the right to repeal these Ordinances by referendum is clear. The Norfolk City Charter provides citizens with a right to a referendum on all ordinances except for those that "provide for work, improvement, or repairs" and for ordinances exempted by the referendum process by law. In this case, these Ordinances do not "provide for work, improvement, or repair," and no Virginia case expressly prohibits these Ordinances from the referendum process.

Consequently, the City's Motions will be denied and exceptions noted.