**BOCA VILLAS CORPORATION, et al v. PENCE,**
**Chief Building Inspector, Boca Raton, et al.**
No. 73 106 CA (L) 01 F.
**KEATING-MEREDITH PROPERTIES, Inc. v. CITY OF BOCA RATON.**
No. 73 540 CA (L) 01 F.
Circuit Court, Palm Beach County.
September 30, 1976.

Tylander, deClaire, Becker & Van Kleeck, Boca Raton, and Cone, Wagner, Nugent, Johnson & McKeown, West Palm Beach, for the plaintiffs.

Jerome F. Skrandel, City Attorney, and Frates, Floyd, Pearson, Stewart, Proenza & Richman, Miami, for the defendants.

Brown, Smith, Young & Pelham, Tallahassee, for the Florida Home Builders Association, amicus curiae.

**THOMAS E. SHOLTS, Circuit Judge.**

*Final judgment:* This cause came on for trial without jury upon consolidated complaints of two owners of property located within the city of Boca Raton to obtain certain zoning for their properties based upon attack on the constitutionality of the city's charter amendment §12.09 commonly known as "the Cap."

The charter amendment is novel in its approach to density control —

> Section 12.09. *Limitation of Number of Dwelling Units —*
> The total number of dwelling units within the existing boundaries of the city is hereby limited to forty thousand. No building permit shall be issued for the construction of a dwelling unit within the city which would permit the total number of dwelling units within the city to exceed forty thousand.

Plaintiffs allege the charter amendment and implementing ordinances are violative of the equal protection and due process clauses of the constitution of Florida and of the United States, and the Fifth and Fourteenth Amendments and the Commerce Clause of the United States Constiution.

Plaintiffs argued —

(a)  The Cap and implementation infringed upon the constitutional right to travel.

(b)  Prevented the city of Boca Raton from absorbing its "fair share" of housing for the regional area.

(c)  The Cap was not "necessary" but was exclusionary in effect and the city therefore had the burden of establishing a "compelling state interest"[1] for enactment.

(d)  Plaintiffs also question whether or not constitutional guarantees of procedural due process were thwarted by use of the initiative referendum process.  (In Florida there is a direct split of authority — *Andover Development Corporation v. City of New Smyrna Beach,* 328 So.2d 231 (Fla. 1st DCA 1976), Case Nos. W-322 and W-342 supporting plaintiffs' argument, and *City of Coral Gables v. Carmichael,* 56 So.2d 404 (Fla. 3rd DCA 1972), supporting defendant's argument that zoning may be adopted by referendum.  Undoubtedly, this conflict will be resolved by the Florida Supreme Court, if not already resolved by the U. S. Supreme Court in *City of Eastlake v. Forest City Enterprises, Inc.,* 96 S.Ct. 2358 (1976).  It is not necessary, however, to resolve that issue here because the Cap and implementing ordinances are contrary to constitutional requirements of substantive due process and equal protection in the first place.)

The city argued —

(a)  The challenged legislation bore a rational relationship to legitimate state purposes of control of density, maintenance of a balanced community, and the validity thereof was "fairly debatable."[2]

---

1.  The test promulgated by the U. S. Supreme Court where "fundamental" rights guaranteed by the constitution are infringed such as "right to travel," *Shapiro v. Thompson,* 394 U. S. 618 (1969); "right to vote," *Griffin v. Illinois,* 351 U. S. 12 (1956); "right of association," *NAACP v. Alabama ex rel. Patterson,* 357 U. S. 449 (1958); "access to the courts," *NAACP v. Button,* 371 U. S. 415 (1963); or any "rights of privacy," *Griswold v. Connecticut,* 381 U. S. 479 (1965).

2.  *Euclid v. Ambler,* 272 U. S. 365 (1926), and its prolific Florida progeny with exception of *Rural New Town Inc. v. Palm Beach County,* 315 So.2d 478 (Fla. 4th DCA 1975), and *Davis v. Sails,* 318 So.2d 214 (Fla. 1st DCA 1975).

(b) The Cap and its implementing ordinances were no more exclusionary than ordinary similar zoning.

\* \* \*

Specifically, the plaintiff in Case No. 73-106 CA (L) 01, Samuel Fletcher as trustee for the property hereafter referred to as "Boca Villas," alleges rezoning of its approximately 32 acres from multi-family to single-family (3.1 dwelling units per acre) is irrational and confiscatory; the plaintiff in Case No. 73-540 CA (L) 01, known as "Keating-Meredith," whose property retains its original zoning category with density reduced from 19 to 9.5 dwelling units per acre, makes the same argument.

In reaching the findings of fact and conclusions of law which follow, the court heard extensive testimony, much of which came from local and national experts and reviewed the numerous briefs filed by the parties, including that of the Florida Home Builders Association as amicus curiae.

The Cap resulted from a citizens' initiative and referendum election pursuant to charter. It is agreed the charter amendment is not self-executing, nor does it zone, nor was its original enactment based on scientific studies or professional planning. Its necessary implementation resulted from a long, torturous process while plaintiffs' properties, along with all other undeveloped property, remained under moratorium.[3]

The court does not quarrel with the wisdom of citizens choosing various methods to control growth. If a reduction in Boca Raton's overall residential densities to 40,000 units would rationally promote public welfare without unnecessary and unreasonable consequences to private property rights, the city could legally utilize a variety of techniques, including a form of Cap. However, consequences of the Boca Raton Cap emphatically distinguish it from existing and allowable densities developed as normally done in most cities. At the outset, the court is deeply concerned about the manner in which the charter amendment's specific limitation of dwelling units was arrived at and enacted. Its passage without benefit of professional or scientific study is crude and repugnant to the court's concept of orderly legislative action. *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 Fed. 2d 956 (1st Cir. 1972). Although expressly disapproving of the Cap's unsound origin, the court is aware of its limited role in determining not the

---

3. The city enacted numerous interim moratorium ordinances to maintain the status quo pending studies to determine how the goals set forth in the charter amendment could be implemented. A moratorium advisory board was established which allowed some builders to proceed with construction subject to accepting substantial density reductions.

wisdom of the legislation but whether it is "permissible within the relevant and constitutional framework." *Steel Hill,* supra. In short, does the charter amendment with implementing ordinances bear "a rational relationship to a permissible municipal objective"?[4] While the test sounds simple, its application requires consideration of complicated factors and evaluation of weeks of testimony.

The city of Boca Raton consists of 25.46 square miles, is located along the southern portion of Palm Beach County, borders on the Atlantic Ocean and is one of the fastest growing communities in Palm Beach County. Between 1950 and 1970, its population dramatically increased from 992 to 28,506 persons. It jumped to no less than 43,000 persons by 1974. The city found itself a part of Florida's famed "Gold Coast," faced with the problem of rapid growth which had already ravaged its neighbors to the south.[5] However, Boca Raton differed from most Florida fast-growing cities because of its anticipation and planning for growth impact. Comprehensive planning for the city's future was under way as early as 1957. In 1966 the city's professional staff and advisory officials began revising density ordinances downward in a continuing process. In 1967 the city's consultants, Milo Smith & Associates, prepared a formal written comprehensive plan which proved remarkably accurate regarding growth estimates. Between 1957 and 1972, with assistance from outside consultants, the city continuously planned to achieve an orderly low density community. Stringent environmental and aesthetic legislation was adopted to preserve and improve the city. By 1972 the city contained a broad range of land uses including substantial commercial, industrial and educational facilities. Its former "small town" character had disappeared so that Boca Raton was distinguishable only by the high quality of new construction and superb maintenance of private homes and the relatively high income of its middle-age to elderly citizens.

During 1971 two large developers, Behring and Arvida, were planning 2,000-acre developments in the unincorporated western portion of Boca Raton's reserve area that contemplated approximately 25,000[6] dwelling units. Control over westward expansion became a local election issue and all candidates took a firm stand

---

4. *Village of Belle Terre v. Boraas,* 416 U. S. 1 (1974), the first zoning opinion rendered by the U. S. Sup. Ct. in 48 years or since *Euclid v. Ambler,* supra.

5. This opinion was not only shared by the majority of Boca Raton's citizens but by plaintiffs' experts as well.

6. At that time the city contained a total of 12,343 dwelling units.

favoring annexation and low density development as the ultimate solution. Predictably and understandably, some Boca Raton residents desired to preserve their "quality of life" from hazards of future growth. These feelings took the form of various efforts at arresting development of the Arvida and Behring projects in the unincorporated area west of town.

Meanwhile, the city council asked the Florida legislature's permission to annex the city of University Park, a largely undeveloped area on the western border of Boca Raton, as well as all other unincorporated areas east of the Florida Turnpike within the city's reserve area. Subject to referendum, the Florida legislature approved annexation of University Park but denied annexation of the unincorporated areas. On July 27, 1971, annexation of University Park to Boca Raton was approved by the electorate of both cities.

Eighteen days later Arvida Corporation, controller of University Park, applied for zoning in the newly annexed land requesting densities higher than it actually proposed to use. Over heated protest of the citizenry, Arvida's request was granted on February 8, 1972. The next day citizens began preparing and circulating petitions pursuant to Chapter XI of their charter resulting in eventual repeal of the Arvida ordinances a few months later. Legality of the referendum was recently decided by this court in favor of the city on Arvida's claim of estoppel in *Arvida Corporation v. City of Boca Raton,* Case No. 74 1431 CA (L) 01 F (Fla. 15th Cir. Ct. 1976).

In March 1972 the city contracted with its land planners, Milo. Smith & Associates, to update the city's original comprehensive land use plan originally prepared in 1967 and 1968. On April 11, 1972 an emergency ordinance imposed a 60-day moratorium on zoning for the asserted purpose of studying problems of water, sewage, schools and density.

Such efforts notwithstanding, the citizens involved in the Arvida initiative process believed future growth of the city was not safely entrusted to their elected councilmen and the "ultimate" solution was therefore devised — it was the Cap Charter Amendment — this, although the city's planning director, Walter Young, testified Boca Raton's planning for future growth (before Cap adoption) was "second to none" which planning included analysis of present and future population, recreation, open space, roads, sewer and water utilities and water resources. The situation was such that the city's planning director, its engineering director, its sewer and water engineering consultants, its planning consultants for eight years, and two successive chairmen of its planning and zoning board testified they were aware of no present or potential inade-

quacy in Boca Raton's facilities, services, carrying capacity of its land, its resources or environment which required a Cap on housing or population.

On June 27, 1972, the conservation committee of the Royal Palm Audubon Society submitted to the city council a report entitled *The Problems of Growth.* Five major areas were superficially studied without benefit of competent scientific research — water quality and quantity, schools, the social impact and economic effects of population growth and the proposed planned unit development ordinance. The report included a recommendation the city's ultimate population be limited to 105,000 people.

With the Audubon report as background, a proposed ordinance providing for referendum on a charter amendment limiting the total number of dwelling units within the city limits to 40,000 was scheduled for public hearing before the city council on July 25, 1972. After extensive discussion pro and con, the Cap Amendment referendum ordinance failed to pass for lack of a second.

Utilizing again the initiative and referendum provisions of the city's charter, a small group of citizens caused the Cap to be submitted to the electorate in early August, 1972. Thereafter, a "Citizens for Reasonable Growth Committee" was formed to advocate passage of the Cap amendment. On November 7, 1972, by a vote of 7,722 to 5,626, the electorate amended the city's charter by adding the Cap.

The Audubon committee members drafted their report and Charter Section 12.09 without expert assistance. They utterly failed to coordinate with the city's administration or its outside planning and utility consultants. It is not therefore surprising that an elemental mistake was made. When the citizens group converted the desired population of 105,000 to dwelling units they selected single-family census statistics of 2.6 persons per dwelling unit, totally ignoring the lower multi-family population statistics of 2.05 persons per dwelling unit. When multi-family statistics are properly combined with single-family statistics, the average 1972 population for all dwelling units falls between 2.1 and 2.2 persons. It therefore appears the Cap was set too low from the outset and since the 105,000 population limit was grossly unsupported by reasonable competent expert study, the court concludes the Cap was developed through emotional guesswork. See *State ex rel. Henry v. City of Miami,* 158 So. 82 (Fla. 1934), with concurring opinion by Chief Justice Davis at page 84 which states —

> ". . . a zoning ordinance enacted simply as a piece of guesswork with no attempt to study the city's problems and no effort to accomplish some general plan adopted to the

city's needs in the way of health, safety, prosperity, welfare, and the like, and attended by no surety of the existing situation to which it applies is generally unsustainable as a reasonable or valid regulation."

The first draft of the Milo Smith update (prepared before the Cap) suggested a dwelling unit range of 47,000 to 61,000. After passage of the charter amendment, the second draft of the Milo Smith update revised the low figure to 40,000 because these experts did not find that figure unreasonably low.[7] Frankly, the court simply cannot accept as valid this ex-post-facto revision because it seems Milo Smith, under obvious pressure, applied the reverse of that old adage "close only counts in horseshoes." Nevertheless, after reviewing the planning and zoning board's recommended final implementation, Milo Smith found such implementation reasonable and in accord with its updated Comprehensive Land Use Plan but suggested the Cap and its implementing ordinances be subject to periodic review and updating. Accordingly, the city enacted Ordinance 1966 which mandates review of the Cap and resubmission to the electorate every two years.[8]

In March 1973 the city council submitted to the electorate (while interim moratoria were in effect to allow implementation of the Cap) a proposal to increase the Cap by 15% with 4,000 of the increased dwelling units allocated to Arvida Corporation, apparently for settlement of Arvida's lawsuit challenging validity of the limitation, which proposition was rejected by the voters.

On July 18, 1973, temporary interim density reductions amounting to 50% on an "across-the-board basis" were enacted for all multiple dwelling units. Between the initial moratoria and the Cap's final implementation in March 1975, the city conducted studies to arrive at some means of implementing the absolute mandate dictated by the Cap. In August 1973 the city contracted with Ashley Economic Services, Inc. of California and Veri & Associates of Florida, for an environmental, fiscal, legal, political, economic and social study of the city. Meanwhile, the city on September 18, 1973, enacted a "third interim moratorium ordinance" which established an additional 10% "across-the-board" temporary density reduction and which expressed the city's intent

---

7. Milo Smith testified — "Well, the decision was we felt, yes, it could be practical to go ahead and apply the new updated plan because of the difference between the forty thousand was not substantial enough to make the research work and proposal that we had in the report invalid. It was close enough that it could be adjusted."

8. The review ordinance was introduced on April 2, 1974 and enacted on May 4, 1974.

to provide sufficient time to evaluate the Milo Smith update and the Ashley-Veri Report before final implementation of the charter amendment. The court has previously referred to the Milo Smith update and the firm's recommendation pertaining to the periodic review and update of the Cap. The Ashley-Veri report is mentioned later in this judgment.

On March 26, 1974, the city council approved the planning and zoning board recommendation to finally implement the Cap by — (a) permanently enacting a 50% "across-the-board" density reduction, (b) repealing the last 10% density cut applicable to all residential categories, and (c) providing for termination of the moratorium.

Unfortunately, when the Cap was adopted, it became the function of the city administration to implement the absolute mandate dictated by its citizens, and therefore the Cap cannot be considered in a vacuum but must be judged together with its final implementing ordinances since those ordinances affect plaintiffs' property rights. Because there had been no study or competent effort to determine "how and with what effect" the Cap would be implemented once passed, its passage imposed an almost impossible burden on the city's zoning officials. Confusion was rampant and extraordinary techniques were used to reduce overall density to 40,000 dwelling units. The city *was compelled* (emphasis supplied) to adopt arbitrary and discriminatory multi-family zoning densities to carry out the Cap choice of its citizens. If "across-the-board" 50% density reduction in multi-family zoning classifications imposed under Cap implementation bear any reasonable relationship to characteristics of the properties or areas involved, it is by pure accident. Interestingly, despite extreme effort, the city's zoning presently permits approximately 44,000 dwelling units, or 4,000 units short of full implementation. An additional 4,000 unit cut of vacant multi or single-family property appears impossible and since Boca Raton is a growing city, replacement of existing housing stock at current low density will not occur in sufficient numbers to solve the problem.

At trial, 35 witnesses testified, mostly experts for both sides, including three appraisers, eleven city planners and four experts on water supply and quality. The vast majority of testimony related to questions of whether the Cap and implementing ordinances were discriminatory, exclusionary in purpose or effect, confiscatory or arbitrary, and whether there was any rational basis for the Cap.

The court believes the manner of Cap selection does not necessarily invalidate it. If a fixed limit on housing substantially and

rationally promotes public welfare, it may well pass constitutional muster. Regrettably, in Boca Raton, such is simply not the case. The evidence concerning the Cap's emotional and arbitrary birth, its unreasonable effects and the lack of a material, factual and substantial relationship to public welfare is so compelling that fair debate should not really be expected. Although the Cap may represent the desires of a majority of the city's voting population, that choice must not and cannot override a constitutional imperative — the electorate may act only to promote substantial public welfare, without exceeding the bounds of necessity. *Lawton v. Steele,* 152 U. S. 133 (1894); *Goldblatt v. Town of Hempstead,* 368 U. S. 892 (1962); *Dean Milk Co. v. Madison,* 340 U. S. 349 (1951); *Burritt v. Harris,* 172 So.2d 820 (Fla. 1965); *Corneal v. State Plant. Bd.,* 95 So.2d 1 (Fla. 1957); *William Murray Builders Inc. v. City of Jacksonville,* 254 So.2d 364 (Fla. 1st DCA 1971); *Davis v. Sails,* supra. Nonetheless, the court in deciding this case will apply the "fairly debatable" rule to the issues. The court concludes and finds that the 40,000 dwelling unit Cap and its multi-family implementation are irrational. Three examples of the irrational consequences caused by the Cap stand out —

A. The court has previously referred to the fact that despite extreme effort the city's post-cap zoning presently allows approximately 44,000 dwelling units or 4,000 units short of full implementation. In fact, multi-family classifications are the only type housing where replacement will result in any appreciable reduction in overall density and the evidence suggests this type housing density may be depleted as early as 1985. As a direct result, the Cap imposed upon Boca Raton taxpayers a burden of making massive public expenditure to acquire vacant property.[9] Only minimal sums had previously been budgeted for public land acquisition. Thus it seems contrary to public welfare to require present taxpayers to purchase unidentified vacant land at some future time for unspecified amounts of money to fill such needs.

---

9. In a review of all multi-family classifications, the lowest land cost per unit in the city was approximately $5,000. This would suggest a minimum expenditure of $20,000,000 if public acquisitions are required to implement the Cap. A rezoning of substantial vacant properties to commercial, hotel or motel and industrial uses is not the answer. The city's reports and evidence in the record establish the city already contains a surplus of said properties and that such a drastic shift from the residential to commercial sector would materially and detrimentally alter the residential character of the city. If owners of vacant residentially zoned property were completely denied any residential building permits a confiscation would undoubtedly occur.

B. The second irrational consequence of Cap implementation arises from inadequate consideration of the type growth sought to be limited. The Cap applies only to "dwelling units" and was so implemented. It does not apply to hotel and motel units (of which there are 382,000 allowable) or to commercial or industrial properties. The record indicates there may be a surplus of these properties within the city. Any needed change in land use classification from hotel and motel, commercial or industrial, is severely inhibited because rezoning to residential use would add to the overall 44,000 units presently allowed.

C. A third irrational (and arbitrary and discriminatory) consequence of Cap implementation is the unfair treatment given owners of vacant multi-family property. As part of implementation the city set single-family densities by comparing "as built construction" in existing subdivisions. A similar "as built" study was conducted in multi-family classifications which, for example, showed the R-3 classification as developed from 23 to 29 units per acre, depending on location. Without consideration of effect, multi-family classifications were slashed 50% after previously having been reduced by approximately 30% in October, 1972, one month before Cap adoption. In its zeal to accomplish the absolute mandate called for by the Cap, the city made no good faith attempt to determine whether multi-family implementation densities were reasonable.

Imposition of a Cap without adequate consideration of present and future consequences is evidence, but not sufficient proof alone, of irrationality. Therefore, the court carefully considered the purposes allegedly served by the Cap. In Florida, zoning legislation may be intended to preserve and protect —

(a) Patterns and density of development.
(b) Adequacy of municipal utilities and services.
(c) The character of subject properties and surrounding areas.
(d) The potential for beneficial use of subject properties. *City of Miami Beach v. Weiss,* 217 So.2d 836 (Fla. 1969); *Watson v. Mayflower Properties, Inc.,* 233 So.2d 390 (Fla. 1970).

When legislative judgment is determined rationally related to these and other legitimate interests, the court should not substitute its judgment for that of zoning officials. But here, the court believes there is no real substantial relationship between the Cap and the public purpose allegedly protected and preserved by it. The evidence presented by the city simply failed to establish a sufficient substantial benefit to the public welfare of Boca Raton. *City of*

*Miami v. Weiss*, supra; *City of Miami v. Rosen*, 10 So.2d 307 (Fla. 1942); *City of Miami Beach v. 8701 Collins Ave.*, 77 So.2d 428 (Fla. 1954). Certainly, a Cap chosen by the people creates a planning objective which is definite and firm as to the future. As deduced from opinions of the city's experts,[10] such planning objective is the principal rationale in support of capping. However, where a city such as Boca Raton is demonstrated to have been able to adequately cope with anticipated growth, the court does not consider the certainty of future planning to be a sufficiently substantial benefit as to completely override private property rights. Further, to the extent the Cap represents a decision of the city's citizens to lower density and control growth, the cap's consequences are obviously unnecessarily excessive.

All the study which normally goes into adoption of zoning legislation and which surely must go into adoption of city-wide growth control limits[11] was conducted *after* Cap adoption. These studies were considered by the court since they may nevertheless be valid even though not conducted in a normal or advisable manner. The court's findings regarding after-the-fact studies of the Cap's relationship to public welfare are as follows —

1. Boca Raton's utility systems and services are presently adequate, were adequate prior to the Cap, and there are no present indications of undue strain as a result of further anticipated growth within densities allowed prior to the Cap.

2. Boca Raton's school facilities are presently overcrowded but the adequacy or inadequacy of those facilities is beyond jurisdictional control of the city and therefore unrelated to purported limited growth benefits of a Cap. The court has already spoken to this issue in holding unconstitutional a Boca Raton ordinance requiring developers of unplatted subdivisions to obtain a

10. The city elicited from various planning experts that it could legitimately counteract housing trends by efforts aimed at achieving a "balance" in housing type (against multi-family) and age of population (against elderly). This court finds that the Cap does not distinguish between types of dwelling units or age of population to be housed and as such the Cap is unrelated to any such social "balancing" goals, even if legitimate. Besides, there is no competent evidence that the Cap would or was intended to serve such purposes. The court further notes that none of the City's land planning experts have previously recommended a fixed cap concept for growth limitation to other clients.

11. E.g., *Construction Industry Association of Sonoma County v. City of Petaluma*, 522 F. 2d 897 (9th Cir. 1975), cert. den. 96 S. Ct. 1148 (1976).

letter of intent covering new school construction from the Palm Beach County School Board. *Talmon v. City of Boca Raton,* Case No. 75 4286 CA (L) 01 F (Fla. 15th Cir. Ct. 1976). Further because of Boca Raton's population distribution, the Cap is most likely counterproductive to the entire Palm Beach County public school system. Fiscal studies of both parties confirm Boca Raton now generates a surplus of revenue for schools over and above the cost of school expenditures (including cost of new school construction).

3. Cost-revenue studies by both parties establish greater fiscal surplus will result to general and capital funds of the city without the Cap.

4. Boca Raton's water resources can abundantly withstand anticipated growth so long as proper management policies now in effect are maintained. One of the city's major factual justifications for the Cap was rooted in the "water crop" theory, which purports to limit population by a budget of rainwater falling within city limits. The theory may be useful *regionally* as a factor in water management decision making. However, its argued use as support for the Cap requires the court to completely disregard regional water resources until the city is assured other responsible governmental agencies (U. S. Corps of Engineers, Central and Southern Flood Control District and Lake Worth Drainage District) will continue to protect the municipal interest. Neither the court nor the city can be so assured, but there is no creditable evidence these authorities will fail to carry out the responsibilities delegated to them. It is not rational to completely disregard past efforts, future plans and abundant alternative water resources available to Boca Raton through these regional water-management bodies. The record establishes Boca Raton's water resources can and will ultimately be managed regionally. Water resources will not depend upon a "budget" which Boca Raton or other cities may impose, but rather will depend upon hard social choices involving agricultural priorities, environmental demands, quantity of water used in various sectors, and the cost which society is willing to pay. These are unresolved issues which directly relate to southeastern Florida water demands and resources. A Cap predicated upon preservation of water resources is a preliminary and unnecessarily drastic solution to an area-water resource issue.

5. Boca Raton's air quality and noise levels are normal for a community of its size and are well within state and federal standards and regulations. Anticipated growth will not cause those standards and regulations to be exceeded. The Gerrish Study of air pollution and the Peterson Study of background noise lend no credibility to the Cap or the Ashley-Veri report. Other than the water crop theory and these urban environmental studies, the Ashley-Veri report does not completely support the Cap. In fact, the report's final conclusion suggests as much when recommending (a) the Cap be raised, and (b) that public funds be devoted to acquisition of vacant lands to reduce units.

6. The city's current comprehensive plan and zoning maps were essentially prepared prior to and outside the Cap. There is no showing those plans would be jeopardized or materially affected if the Cap were removed.

7. Much of defendant's case hinged on expert opinion to the effect the Cap represents an important community goal. The case was largely presented in the abstract and without specific factual showing of real necessity. Defendant argues unpersuasively that "necessity is not the test for a city's right to, amend its comprehensive plan." *Burritt v. Harris*, supra, *Davis v. Sails*, supra. The Cap may well be a firm planning goal embodied in legislation. However, legislation as far reaching as this Cap should not be adopted by trial and error. The court is unpersuaded the city's intended review by Ordinance No. 1966 adds present credence to the Cap. If the Cap is now irrational, a legislated promise to later amend, modify or repeal it adds nothing to present validity.

After reviewing the consequences the Cap imposes upon the city's future and the relationship it bears to legitimate governmental purpose, the court considered its present and potential detrimental effect on private property rights. Plaintiffs offered appraisal testimony in an attempt to estimate minimum loss ($50,000,000) of property value imposed after implementation. Of itself, a loss of property value city-wide (even $50,000,000) is not sufficient to invalidate the Cap. *City of Miami Beach v. Wiesen*, supra; *City of Miami v. Zorovich*, 195 So.2d 31 (Fla. 3rd DCA 1967); *Trachsel v. Tamarac*, 311 So.2d 137 (Fla. 4th DCA 1975). However, validity of the Cap city-wide must be assessed in economic terms by balancing public benefit gained against the degree to which individual property rights are affected. *Pennsylvania Coal Co. v. Mahon*, 260 U. S. 393 (1922) and *Nectow v. City of Cambridge*, 277 U. S. 183 (1928); *Averne Bay Construction Co. v. Thatcher*, 15 N. E. 2d 587 (N. Y. App. 1938). In its best light, the Cap's real public benefit is to clearly and concretely focus the community's choice upon low density. At worst, such community choice is seen as an attempt to eliminate individual zoning density decisions from the normal legal process. Whether or not the loss in property value was $50,000,000 or less, it is certainly enough, coupled with the implementation fiasco, to outweigh any minimal benefit.[12]

Additionally, the Cap and its implementing zoning raise an even more serious question of public welfare — development of an exclusionary zoning pattern. When one is confronted with Boca Raton's Cap, the impression is unmistakable, the legislation is of the "I'm aboard, Jack. Pull-up-the-ladder" variety. As the city points out, the Cap is not necessarily an exclusionary measure adopted for selfish purposes or worse, and the court has not inquired

---

**12.** It is noted that neither the citizens who promoted the Cap nor the city which implemented it gave any consideration to the effect their actions would have on individual property owners although with some reasonable effort this could have been done.

into motives, but its effect on housing supply has been to eliminate possibility of private construction of low and moderate income housing. For example, some 26.9% of Boca Raton's current population maintain a family income of $10,000 or less. After the Cap, the city's reports establish no new housing will be constructed in Boca Raton for low income families and virtually none for those of moderate income —

| *Single Family* | *Number of Units* | | |
|---|---|---|---|
| | 1968-70 | 1971-90 | |
| $20,000-$30,000 | 67 | 0 | |

| *Multi Family* (Condo) | *Number of Units* | | |
|---|---|---|---|
| | 1968-70 | 1971-80 | 1981-90 |
| to $20,000 | 139 | 80 | 0 |
| $20,000-$30,000 | 235 | 390 | 70 |

| *Rental Units* | *Number of Units* | | |
|---|---|---|---|
| | 1971-75 | 1975-80 | 1980-90 |
| to $150/mo. | 150 | — | — |
| $150-$200/mo. | 420 | 310 | 370 |

Plaintiff's appraiser testified the Cap as implemented had the effect of raising the cost of single family and multi-family housing, and as a result the minimum cost of constructing new single family homes, with few exceptions, rose to $50,000, and for multi-family to $40,000, although below that price only approximately 200 single family homes could be built within a range of $32,000 to $37,000.

Recently, some state courts have required that growing communities must provide a fair share of regional housing demands. See *Southern Burlington NAACP v. Township of Mount Laurel,* 336 A. 2d 713 (N. J. 1975); *In re Appeal of Girsh,* 263 A. 2d 395 (Pa. 1970); *In re Appeal of Kit Mar Builders, Inc.,* 268 A 2d 765 (Pa. 1970); *Berenson v. Town of New Castle,* 38 N.Y. 2d 102 (378 N.Y.S. 2d 672, 1975). This court does not find it necessary to hold that Boca Raton failed to meet low and moderate housing obligations inasmuch as the Cap violates constitutional due process requirements of a "rational relationship" to a "permissible state objective" as required in *Euclid v. Ambler* and *Village of Belle Terre,* supra. The court does believe that when a developing and varied community such as Boca Raton makes a land use decision of substantial city-wide magnitude, some consideration must be given possible effects of unnecessarily shifting unwanted housing responsibilities to neighboring communities. Such consideration should be included in the assessment of the rationality of the legislation. Viewed in this manner, the Cap imposes an unnecessary low and moderate income housing burden on neighboring com-

munities and Boca Raton's neighbors are presently unable to fulfill this demand. See Palm Beach County Housing Studies, June 1973, Plaintiffs' Exhibit 92, and April 1972, Plaintiffs' Exhibit 93.

Turning to the subject property, the court finds the Cap implementing ordinances prevent plaintiffs from beneficially utilizing their property under present allowable uses. Confiscation has accordingly resulted to both plaintiffs.

Plaintiff, Samuel Fletcher, trustee, is now permitted R-1-D, 3.1 d/u/acre, with a present market value ranging from $238,080 to $400,000 depending upon the appraiser. Faced with a large inventory of unsold single family lots lying immediately to the north, Mr. Fletcher's zoning and density prohibit beneficial development within the foreseeable future.[13]

The property of plaintiff Keating-Meredith Properties, Inc. is located within an established multi-family rental neighborhood developed at a much higher density than the 9.5 d/u/acre now allowed after implementation. Keating-Meredith invested $238,000 in property acquisition. Mr. Howard Keating testified it was not feasible to develop or secure financing for development at implementation density. Plaintiff's evidence shows the Keating-Meredith property could not be beneficially developed or sold for any permitted use within the foreseeable future.

Plaintiff's confiscation testimony was largely unrefuted. The city's appraisers made no development study of plaintiffs' properties. Further, the city's appraisers were unable to testify when either plaintiff might foreseeably expect a return of their out-of-pocket investment in the properties.

Lastly, this court has heretofore expressed concern about the after-the-fact justification for the Cap and the manner in which it originated. The court is aware of the attitude of distrust that

---

13. The city argues Fletcher's property was rezoned independent of the Cap. The record of the city planning and zoning board minutes (Plaintiffs' Exhibit 13) reveal the Cap had significant impetus on the decision to change this zoning classification. It is impossible to determine if that zoning decision could have been independently developed. Board Chairman Rogers' privately held planning maps are not persuasive and certainly cannot now be used as evidence of the city's intent to change zoning. Plaintiff was developing plans and providing utilities and roadway dedications to the city after Chairman Rogers' maps were prepared. In any event this plaintiff is not required to prove the change to single family zoning was part of Cap implementation since Mr. Fletcher has established the existing zoning applied to his property is confiscatory and the density of 3.1 d/u/acre was arrived at in the Cap implementation process.

many citizens of Boca Raton harbor against their elected officials. In this regard, the citizens of Boca Raton must understand —

(a) The initiative referendum process although itself valid cannot be used as a means of circumventing the law.

(b) Actions taken pursuant to the initiative referendum process are subject to the same judicial scrutiny as are the acts of the city council.

\* \* \*

Based on the foregoing, it is ordered and adjudged —

1. Section 12.09 of the Charter of the City of Boca Raton *"Limitation of Number of Dwelling Units"* violates Florida and federal constitutional guarantees of due process and is void and of no further force and effect.

2. The multi-family zoning densities imposed under Boca Raton Ordinance No. 1952 and its predecessors beginning with Ordinance No. 1733 and successors have no other reason for existence other than to implement Charter Section 12.09. Such ordinances violate constitutional guarantees of due process and equal protection and are void and of no further force and effect. Zoning densities in effect prior to November 7, 1972 are accordingly in force and effect, provided nothing herein shall prohibit the city from adopting other zoning laws and related measures so long as they substantially and rationally promote the public health, safety and welfare without unnecessary abridgement of private property rights.

3. The current zoning density of 3.1 d/u/acre imposed upon the property of plaintiff, Samuel Fletcher, Trustee, under Boca Raton Ordinance 1963 and successors is confiscatory, void and of no further force and effect and the city is directed to rezone said property to a classification and use no more restrictive than Boca Raton, R-3, 13 d/u/acre — any lesser density being deemed confiscatory.

4. The current zoning density of 9.5 d/u/acre imposed upon the property of plaintiff, Keating-Meredith Properties, Inc., under Boca Raton Ordinance 1952 and successors is confiscatory, void and of no further force and effect and the city is directed to rezone said property to a classification and use no more restrictive than Boca Raton, R-3 18 d/u/acre — any lesser density being deemed confiscatory.

5. The court retains jurisdiction to carry out the terms of this judgment. Costs, if any, shall be awarded after motion upon notice.